UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 MAY -7 AM 11: 2?

U.S. DISTRICT COURT
N.D. OF ALABAMA

EARLINE MARIA DAVIS )
)
    Plaintiff, )
)
vs. )    Civil Action No. CV-01-S-0652-S
)
THE CITY OF BIRMINGHAM, )
ALABAMA, )
)
    Defendant. )

ENTERED

MAY - 7 2002

## MEMORANDUM OPINION

Earline Maria Davis initially claimed that her former employer, the City of Birmingham, Alabama, subjected her to a sexual hostile work environment, and, retaliated against her for having complained of sexual harassment and/or for filing a charge of discrimination with the Equal Employment Opportunity Commission, by: continuing to harass her; denying her a requested job transfer; removing her from light duty status without adequate cause; terminating her employment; and, failing to re-employ her. All of plaintiff's claims were based upon Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* After conducting discovery, plaintiff filed a motion seeking partial dismissal with prejudice of all claims, except her claim alleging that the City retaliated against her "by refusing to re-employ her after she was placed on the re-hire list because she had internally complained of sexual harassment and/or filed a charge of discrimination with the EEOC." (Doc. no. 23.) This court granted plaintiff's motion on January 15, 2002 (doc. no. 25). The action now is before the court on the City's motion for summary judgment.

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that defendant's motion for summary judgment is due to be granted.

## I. STATEMENT OF FACTS

Plaintiff began working for the City of Birmingham, Alabama (the "City") in May of 1993 as a landscape laborer.[1] She transferred to the City's Park and Recreation Board in February of 1994

---

[1] Plaintiff's Evidentiary Submission (doc. no. 33), tab 4 (plaintiff's deposition), at 10-11. Plaintiff testified that she began her employment with the City's Horticulture and Urban Forestry Department ("HUF"). However, Kaye Oden, the district supervisor for the eastern division of HUF, testified in deposition that HUF was not created until 1996 or 1997. Prior to that time, all the functions later performed by HUF were performed under the auspices of the "Park and Recreation Department." If so, then plaintiff would have initially worked for the Park and Recreation Board, rather than

and continued to work as a landscape laborer and, temporarily, as a truck driver.[2] She remained with the Park and Recreation Board until 1997, at which time she transferred to the City's Horticulture and Urban Forestry Department.[3] Plaintiff's duties while working for both the Park and Recreation Board and for the Horticulture and Urban Forestry Department consisted of: operating grass cutting, trimming, and leaf vacuuming equipment; raking leaves and grass clippings; picking up litter and other debris; trimming shrubbery in city parks and landscaped areas; and, cleaning rest rooms, tennis courts, and other recreation areas.[4]

## A.    Facts Relevant to Plaintiff's Sexual Harassment Complaint and Original EEOC Charge

Employees of the Park and Recreation Board were assigned to a particular truck. Each truck assignment consisted of one supervisor/truck driver and three laborers. Plaintiff was assigned as a laborer — along with John Redwine and another, unidentified laborer — to a truck supervised and driven by Elmo Carter.[5] Plaintiff began to experience problems with her co-worker, John Redwine, in late September 1994. He made sexual remarks regarding plaintiff's breasts and buttocks, asked her to engage in sexual intercourse and oral sex with him, and (presumably when plaintiff made clear that she did not welcome Redwine's attention) referred to her by such offensive slurs as "bitch" and "whore."[6] Redwine also leered at plaintiff, touched her in an inappropriate manner, and commented to other co-workers that he wanted to have sexual relations with her.[7] Plaintiff complained of

---

for HUF.  *Id.*, tab 6 (Oden's deposition), at 7-9.

    [2] *Id.*, at 12, 14.

    [3] *Id.*, at 12.

    [4] *Id.*, tab 6 (Oden's deposition), at 49.

    [5] *Id.*, tab 4 (plaintiff's deposition), at 18.

    [6] *Id.*, at 17; *see also id.*, tab 1 (plaintiff's declaration), ¶2.

    [7] Plaintiff's evidentiary submission (do. no. 33), tab 1(plaintiff's declaration), ¶ 2.

Redwine's behavior to the supervisor/driver of her truck crew, Elmo Carter.[8]  In response, Carter assigned plaintiff to the front of the truck, and directed Redwine to ride in the back.[9]  Redwine told plaintiff that Carter had moved her to the front of the truck only because he also wanted to watch "her body parts moving."[10]  When plaintiff told Carter what Redwine had said, Carter suggested that plaintiff speak with Thomas Morris, the immediate district supervisor.[11]  She did, but Morris took no positive action.  Indeed, despite plaintiff's repeated requests, Morris did not transfer either plaintiff or Redwine to a different truck, but merely told plaintiff that she and Redwine needed to learn how to "get along."[12]

Subsequently, in 1996, after obtaining her commercial driver's license, plaintiff applied for, and was awarded, a temporary truck driving position.[13]  Her role as a temporary truck driver also meant that she was acting supervisor of the truck crew.[14]  Despite their past problems, Redwine was assigned to plaintiff's truck.[15]  Plaintiff complained to John Hackett, park maintenance supervisor and Morris' superior.[16]  Hackett requested that plaintiff submit a written statement of her complaints. She complied.[17]  A few days later, Redwine was required to submit to a drug test, and tested positive. He then was required to enroll in a drug rehabilitation facility as a condition of retaining employment

---

[8] *Id.*, tab 4 (plaintiff's deposition), at 17.

[9] *Id.*, at 17.

[10] *Id.*, at 17.

[11] *Id.*, at 18.

[12] *Id.*, at 19.

[13] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 22.

[14] *Id.*, at 23.

[15] *Id.*, at 23.

[16] *Id.*, at 20.

[17] *Id.*, at 20-21.

with the City.[18]  While plaintiff did not learn the outcome of the written complaint she submitted to John Hackett, it is undisputed that she and Redwine were not again assigned to work together following his completion of the rehabilitation program and return to work.[19]

Plaintiff transferred to the *western division* of the City's Horticulture and Urban Forestry Department ("HUF") on July 7, 1997.[20]  What she did not know at the time was that Redwine had transferred to HUF's *eastern division*.[21]  The work crews for both divisions met at the same place — the city fairgrounds, HUF's headquarters — twice each day:  in the mornings, to receive daily work assignments and gather equipment; and again at the end of each work day, to return and clean equipment.[22]  When plaintiff learned that she would be exposed to Redwine at the beginning and end of each work day, she went to see Kaye Oden, the district supervisor for HUF's *eastern division (i.e.,* the division to which Redwine, not plaintiff, was assigned), and recounted the problems she had experienced while working with Redwine at the Park and Recreation Board.[23]  Oden told plaintiff that she "didn't have to worry about Redwine[,] because Jamie Boynton [HUF's director] would not allow anything like that to happen in their department[,] and that she wouldn't put [plaintiff and Redwine] together."[24]  Oden was as good as her word:  plaintiff and Redwine were never assigned to the same work crew, nor to projects in the same areas.[25]

Plaintiff nevertheless experienced additional problems with Redwine during September of

---

[18] *Id.,* at 21.

[19] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 24.

[20] *Id.,* at 26-27.

[21] *Id.,* at 26.

[22] *Id.,* at 33.

[23] *Id.,* at 31.

[24] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 31.

[25] *Id.,* at 32.

1997. When she and Redwine were at HUF headquarters, Redwine would stare at plaintiff in a way that made her uncomfortable.[26] He also approached members of plaintiff's work crew and asked about her.[27] As a result of Redwine's behavior, plaintiff complained to Tom Meacham, the district supervisor for HUF's *western division* (*i.e.*, the division to which plaintiff was assigned).[28] Meacham's response was non-responsive: "as long as he's not working on your truck with you, if he's not saying anything to you, don't worry about it."[29]

Thereafter, on December 7, 1997, while plaintiff was talking to Becky Doonan, HUF's payroll coordinator, Redwine approached plaintiff, patted her on the shoulder, and told her that she had dirt on the seat of her trousers.[30] Plaintiff described the incident in her deposition in the following manner:

> John Redwine came from one side of the building over to the side where me and Ms. Doonan was talking. I said, Ms. Doonan, let's move back some. So, as I got up off the table with my back turned walking back from him, he puts the phone down, run up to me, patting me on my shoulder, Maria, Maria, you got dirt on your butt. And I froze. And I told him don't put your hand on me....

> ...

> Q.    And what happened after you told him don't touch you?

> A.    He just looked at me. And I clocked out and I — I left.

> Q.    Well, did he touch you again?

> A.    No, he didn't touch me again.[31]

---

[26] *Id.*, at 33-34; *see also id.*, tab 1 (plaintiff's declaration), ¶ 3.

[27] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 35.

[28] *Id.*, at 36.

[29] *Id.*, at 36-37.

[30] *Id.*, at 44.

[31] *Id.*, at 44-45.

Plaintiff immediately complained to Kaye Oden, supervisor of HUF's *eastern division*, who advised that she see Jamie Boynton, HUF's director.[32]  After speaking with Oden, plaintiff lodged a written complaint regarding the December 7, 1997 incident.[33]  After submitting her written complaint, she again met with Boynton in January of 1998.  Boynton said he had no knowledge of the problems she had experienced with Redwine while working for the Park and Recreation Board, but he would review her files.  (Boynton later informed plaintiff that the Park and Recreation Board either had no files relating to her complaints about Redwine's objectionable conduct, or had not retained such files.[34])  Shortly thereafter, plaintiff injured her back while unloading brush limbs and/or garbage from the truck to which she was assigned in January of 1998.[35]  She requested, and was granted, injury leave with pay.[36]  The record does not establish how long plaintiff remained on paid leave.

Boynton nevertheless continued to investigate plaintiff's complaint about Redwine's behavior during her absence.  During the course of that investigation, Becky Doonan submitted a statement regarding the December 7, 1997 incident, reading as follows: "I observed John Redwine touch Earline Maria Davis on her upper back and telling [sic] her that she had dirt on the back of her pants.  (She had on work trousers).  He said nothing else."[37]  Before Boynton concluded his investigation, however, plaintiff filed a charge of discrimination with the EEOC.  Her February 9, 1998 charge alleged:

> I.      I was hired by the above employer [the City of Birmingham] in May 1993. I have been subjected to sexual harassment since my initial employment.  The most

---

[32] *Id.*, at 39.

[33] Defendant's evidentiary submission (doc. no. 29), tab 4, at unnumbered page 3.

[34] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 40.

[35] *Id.*, at 48.

[36] *Id.*, at 50.

[37] Defendant's evidentiary submission (doc. no. 29), tab 4, at unnumbered page 2.

recent occurrence was during January 1998.[38]

II.     No reason has been offered for the action.

III.    I believe I have been discriminated against because of my sex, female, by being subjected to sexual harassment, in violation of Title VII of the C[ivil] R[ights] A[ct] of 1964, as amended.[39]

After learning that plaintiff had filed the foregoing charge, Boynton terminated his investigation and

notified plaintiff of his tentative findings by means of a letter dated February 17, 1998, which reads:

After reviewing written statements and information received during oral interviews, the facts lead me to believe that the allegations of sexual harassment are inconclusive. Being that an EEOC complaint has been filed with regard to this incident, I am forwarding all written statements to the Department of City Personnel and the City Law Department for further investigation.

In light of the fact that apparently there has been an ongoing situation between the two parties, I am temporarily reassigning Mr. Redwine to our site operation at East Lake Park effective Monday, February 23, 1998. Mr. Redwine will report directly to the site facility and will be under the direction of the site Gardener, Kennie Shelton and under the supervision of the Park Maintenance Supervisor, Thomas Morris.[40]

Following Redwine's reassignment, plaintiff had no further contact with him during the remainder

of her employment by the City.[41] Subsequently, plaintiff met with Boynton and Ann Smith, a

member of the City's Personnel Department, to discuss whether she was satisfied with the City's

reassignment of Redwine. Plaintiff indicated that she was satisfied.[42]

## B.     Facts Relevant to Plaintiff's Retaliation Claim

To place plaintiff's retaliation claim in proper context, it is necessary to back-up in the

---

[38] There is nothing in the record tending to indicate the nature of the January 1998 incident to which plaintiff refers in her EEOC charge.

[39] *Id.*, tab 6.

[40] *Id.*, tab 4, at unnumbered page 1.

[41] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 52.

[42] *Id.*, at 45.

chronological narrative about six months, to September or October of 1997, when plaintiff suffered from severe bronchitis, and missed almost one month of work.[43]  At that time, plaintiff was assigned to a grass cutting crew, which consisted of one supervisor, Robert Wiggins, and three laborers. When plaintiff returned to work, she did so under orders from her physician, Dr. Gregory Flippo, directing her to avoid work that might aggravate her bronchitis, such as jobs requiring her to inhale grass clippings or gasoline fumes.[44]  She therefore requested, and was allowed to perform, such light duty assignments as picking up trash, sweeping curbs, washing equipment and trucks, and moving the crew truck along with the crew.[45]  Plaintiff still was working in a light duty capacity when the following events occurred.[46]

Almost three months after filing her original, February 9, 1998 EEOC charge, plaintiff was approached by James Horton, HUF's manager of special services, regarding her continued light duty status.  Following that conversation, plaintiff went to see HUF's director, Jamie Boynton, who recorded the following notes from their April 23, 1998 meeting:

> This morning Ms. Davis came to me at [a] scheduled meeting time to make me aware of an incident that occurred on Tuesday afternoon, April 21, 1998. Alleged incident took place on Pearson Avenue in the field where Ms. Davis was approached by our Manager of Special Services, James Horton. She states that Mr. Horton told her that if she could not perform the duties as assigned in the grounds maintenance field that she should seek other employment and/or a transfer to a less strenuous position in another department of the City. She further stated that these statements alarmed her and were causing her stress at this time. I asked Ms. Davis what brought about this conversation and she stated she didn't know, but that Mr. Horton just approached her when he arrived in the field and the issue came up. Ms. Davis made reference to her bronchitis condition for which she is being treated by Dr. Gregory Flippo and is using

---

[43] *Id.*, at 52.  Plaintiff indicates in her deposition that she began suffering from bronchitis in 1998. However, after reviewing plaintiff's affidavit and the sequence of events, her deposition statement regarding the date of the bronchitis appears to be a simple mistake.

[44] *Id.*, at 53-54, 62.

[45] *Id.*, at 53-54; *see also id.*, tab 1 (plaintiff's declaration), ¶ 6.

[46] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 54.

prescribed medication.  Ms. Davis indicated that she is still currently taking bronchitis medication "as needed."  She further indicated that she had a visit with Dr. Flippo in March of 1998.  During this March visit with Dr. Flippo Ms. Davis states that Dr. Flippo recommended she restrain herself from duties that involve grass mowing and exposure to grass clippings.  She indicated to me that this condition is compounded by working in and around grass clippings and that duties such as grass mowing, string trimming, etc., only aggravate her medical condition.  I asked Ms. Davis at the present time what her assigned duties are as it relates to the crew she is working on.  She indicated that Robert Riggins, Landscape Supervisor, has assigned her the responsibility of de-littering ahead of the mower operators and relocating the service vehicle as necessary along the right-of-way being serviced.  I asked if these assigned duties were aggravating her bronchitis condition and she indicated that, no, they were not.  I further informed Ms. Davis that I would have to review her file and medical release forms on record that came from Dr. Flippo in order to verify that the duties she is currently assigned are appropriate for her medical condition.  I asked Ms. Davis if she was getting along with crew members and the supervisor to which she is assigned.  She said yes, she enjoyed working on Mr. Riggins crew and that there seemed to be an understanding of what everyone's duties were in the field.  I informed her that I would look into the incident that occurred on Tuesday, April 21, 1998, involving Mr. Horton, and also informed her that I would be looking into her current medical condition and how it relates to the job duties of her classification, as well as her current assignment.  That was the end of the meeting with Ms. Davis on this date.[47]

The next day, April 24, 1998, Boynton sent plaintiff the following memo:

Upon reviewing your personnel file following our meeting yesterday, I saw no documentation that warrants anything other than full duty.  Please be advised that as of this time our records indicate that you can perform any and all Laborer duties associated with the Department of Horticulture & Urban Forestry.  If you feel otherwise, please provide supporting documentation to that effect.[48]

A week later, plaintiff sought a transfer to the street and sanitation division as a truck driver.[49]

Tom Meacham, supervisor of HUF's *western division* (*i.e.*, the division to which plaintiff was assigned), did not oppose her request.[50]  The transfer, however, required certain prerequisites set out

---

[47] Defendant's evidentiary submission (doc. no. 29), tab 8.

[48] *Id.*, tab 9.

[49] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 66-69, 74-75.

[50] *Id.*, at 69.

by the Personnel Board, which plaintiff satisfied.[51]   She then sought approval for her transfer request from the street and sanitation division department head, James Stewart.[52]   Plaintiff spoke with Stewart, and informed him that she had been placed on the Personnel Board's list for approved truck drivers.[53]   Stewart responded that he had heard she was "nothing but trouble."[54]   For reasons unknown, Stewart subsequently left the street and sanitation division,[55] and was replaced by Steven Fancher as the head of that division.[56]   Plaintiff then approached Fancher about the possibility of transferring into his department as a truck driver, but she did not submit a written transfer request form for his approval.[57]

Plaintiff subsequently submitted in May of 1998 a request for a leave of absence for an indefinite period due to stress, anxiety, and depression.[58]   Boynton approved her request for one year beginning May 19, 1998,[59] and sent plaintiff a letter dated May 29, 1998 stating:

> Your request for a medical leave of absence has been approved through May 19, 1999 (See Attachment).   Since a date for return to duty was not specified on your request, you have been granted one year, which is the maximum allowable in accordance with the City of Birmingham Personnel Policies and Procedures.
>
> Your name will be placed on a list for re-employment.   If a position becomes available, you will be interviewed along with other interested applicants.[60]

Along with his May 29th letter, Boynton enclosed a copy of plaintiff's medical leave approval form.

---

[51] *Id.*, at 70.

[52] *Id.*, at 70-71.

[53] *Id.*, at 72.

[54] *Id.*, at 73.

[55] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 77.

[56] *Id.*, at 77.

[57] *Id.*, at 77.

[58] *Id.*, at 79-80.

[59] *Id.*, at 79, 88; *see also* Defendant's evidentiary submission (doc. no. 29), tab 10.

[60] Defendant's evidentiary submission (doc. no. 29), tab 14, at unnumbered page 1.

That form notified plaintiff that she had the right to appeal the grant or denial of medical leave to the

Personnel Board within 10 calender days of receipt.[61]  Plaintiff did not object, nor did she appeal the

one year limitation, or the requirement that she submit to an interview process when she was ready

to return to work.[62]  Plaintiff did, however, file a second charge of discrimination with the EEOC on

June 12, 1998, alleging:

> 1.     I filed a charge of discrimination alleging sexual harassment on
> February 9, 1998.  Since that time, my employer has retaliated against me by
> harassing me, denying me a transfer, taking me off of light duty status without
> adequate cause, and terminating my employment.
>
> 2.     In February of 1998, I asked James Stewart, director of the City's
> Street and Sanitation Department, if I could transfer from the Horticultural and Urban
> Forestry Department and be a truck driver.  I have my commercial driver's license
> and there were and are positions open for truck drivers in his Department.  However,
> he told me that he had heard that I was "trouble" and would not allow me to do so.
>
> 3.     Also in February of 1998, I hurt my back at work.  I went to the City's
> doctor, Dr. Lance, about the problem.  Tom Meacham, my district supervisor, called
> Dr. Lance's office and said that I did not want to work and that I should be put back
> to work as soon as possible.
>
> 4.     Since I have filed the charge, unidentified people have called my
> house and told me that Mr. Redwine, who had been sexually harassing me, did not
> mean anything by his actions and that I was being fired.  I have identified the calls
> as coming from the phone number at my Department.
>
> 5.     I developed bronchitis in about October of 1997.  My doctor advised
> that I not cut grass or do similar activities that I normally did at work that would
> aggravate the problem.  Afterward, my duties were modified such that I would pick
> up trash, prune trees, and do other things that did not cause problems with the
> bronchitis.  I never had any problems with people at work about the bronchitis until
> after I filed the EEOC charge.  On or about April 21, 1998, James Horton, Deputy
> Director of the Department, told me that they did not have anything for me to do in
> the Department and that I needed to find another department to move to.  On or about
> April 24, 1998, James Boynton, the Director of my Department, put me back on full

---

[61] *Id.*, tab 10, at unnumbered page 1.

[62] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 89.

duty though my doctor had not authorized this.

> 6.      On or about May 5, 1998, I asked to be placed on indefinite medical leave because I could not take the harassment and retaliation at work.  My doctor verified that I was undergoing work-related anxiety, stress, and depression.  On or about May 29, 1998, my leave was approved.  However, in granting the leave Mr. Boynton informed me that I will be interviewed with all other applicants in the event a position becomes open.  Consequently, I have essentially been terminated from my employment.

> 7.      Based on the above occurrences, I feel that my employer has retaliated against me for having filed an EEOC charge complaining of sexual harassment.  For these reasons, I am making an amended claim under Title VII of the Civil Rights Act of 1964.[63]

One month after filing her second EEOC charge, plaintiff supplied the City a letter composed

by Dr. Flippo, dated July 8, 1998,[64] and reading as follows:

> Ms. Earline Davis has been under my care for several years.  She was evaluated in my office on 7/9/98 for Vasomotor Rhinitis.  She can return to work on Monday July 13, 1998.  *All job activities can be resumed with the exception of direct exposure to machine fumes.*  If you have any questions regarding this matter please do not hesitate to contact me at my office.[65]

After reading the forgoing letter, Boynton wrote plaintiff on July 15, 1998, saying:

> In a letter dated May 29, 1998 and mailed to you, certified, on June 2, 1998, it was stated that your medical leave-of-absence had been approved.  A copy of your leave request was mailed along with the letter.  Since you could not indicate a date for your return to duty, you were granted one year, which is the maximum allowed in accordance with City of Birmingham Personnel Rules and Regulations.

> This department is in receipt of your medical documentation stating you can return to all job activities with the exception of direct exposure to machine fumes.

> Please be advised that your name has been placed on a list for re-employment.  Any time the department has a position to fill, for which you are qualified, you will be

---

[63] *Id.*, tab 2, at 1-2.

[64] Although Dr. Flippo's letter states that plaintiff visited his office on July 9, 1998, the letter is nonetheless dated July 8, 1998.  Defendant's evidentiary submission (doc. no. 29), tab 12.

[65] *Id.* (emphasis supplied).

13

considered along with other interested applicants.[66]

Plaintiff attempted to return to work in July of 1998, and spoke with Greg Wilson, HUF Deputy Director, and Kaye Oden. Both informed her that her previous position had been filled, but three more laborer positions were available.[67]  Wilson and Oden then scheduled plaintiff for an interview on July 21, 1998.  Both Wilson and Oden were aware of plaintiff's sexual harassment charges.[68]  Plaintiff ultimately was not offered any of the laborer positions, allegedly because:  she could not be directly exposed to machine fumes; she had a poor attendance record; and, she received unfavorable recommendations from her previous supervisors.[69]  Instead, the City hired Derrick Blakenship, Lachaundra Chaney, and Adib Rashid, all of whom had excellent attendance records, training or experience, and favorable recommendation from past supervisors.[70]  Wilson and Oden told plaintiff that they would contact her if a position which did not involve exposure to machine fumes became available.[71]  Wilson testified, however, that plaintiff was considered for every laborer position that was filled for "quite a while."[72]  Plaintiff stopped being considered at some point, however, because she could not perform the duties required of a laborer due to her inability to breathe exhaust fumes and her allergies.[73]  The record, nevertheless, does not indicate exactly when plaintiff's application was no longer considered for available positions within HUF.  Plaintiff contends that she could have been re-hired and assigned to work in a HUF greenhouse, where she

---

[66] *Id.*, tab 13, at unnumbered page 2.

[67] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 98.

[68] *Id.*, tab 6 (Oden's deposition), at 40-41.

[69] *Id.*, tab 6 (Oden's deposition), at 22; *see also* Defendant's evidentiary submission (doc. no. 29), tab 14, at unnumbered page 1.

[70] Defendant's evidentiary submission (doc. no. 29), tab 14, at unnumbered page 1.

[71] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 99-100.

[72] *Id.*, Tab 5 (Wilson's deposition), at 31.

[73] *Id.*, at 31.

would not have been exposed to either grass clippings or exhaust fumes. Oden, however, testified

that greenhouse laborers were required to maintain the grounds around the greenhouse, which would

include mowing and edging grass, and using a gasoline powered blower.[74]

As a result of the City's failure to re-hire plaintiff, she filed a third EEOC charge on July 21,

1998, asserting:

> I.      I have been employed with the above employer [City of Birmingham] for five years as a laborer. In February 1998, I filed a charge of discrimination against the employer. Since then I have been so harassed in the performance of my job that I was required to take a medical leave absence on May 5, 1998. I have tried to return to work but I have not been allowed to do so. The most recent occurrence was July 21, 1998.
>
> II.      The reason given for not allowing me to return to work was that my position had been filled and there was nothing available for me to do, according to Greg Wilson.
>
> III.      I believe I am being discriminated against in retaliation for having filed the original charge (130981272) of discrimination. Employees who have not filed charges of discrimination have taken medical leave and returned to work with no problem when released by the doctor. I am not being afforded this privilege. I was placed on a reemployment list and was told I would have to start over as a new employee.[75]

The City responded to plaintiff's third EEOC charge by means of a letter addressed to Arthur

McGhee in the Birmingham District EEOC office, dated August 2, 1999, and reading as follows:

> As you know, this is Ms. Davis' third EEOC charge. The City still denies that Ms. Davis was subjected to unlawful discrimination. The City denies she suffered retaliation for filing her 1st and 2nd EEOC charges. Ms. Davis requested an unpaid Leave of Absence for an "indefinite period". Ms. Davis was told that the Personnel Board of Jefferson County (Ms. Davis was a civil servant) does not allow the City to approve an "indefinite leave", but allows an unpaid Leave of Absence for up to one (1) year. Ms. Davis was offered and accepted this leave.

---

[74] *Id.*, tab 6 (Oden's deposition), at 23-24.

[75] *Id.*, tab 2, at 3.

15

Until this latest charge Ms. Davis did not claim that the source of her "anxiety" flowed from sex discrimination or harassment. The City denies this allegation. In May 1998, Ms. Davis was granted a shorter leave of absence for "stress" of non-stated origin. She did not claim this "stress" was related to sex discrimination or harassment.

In fact, Mr. Redwine was separated from Ms. Davis. Whatever caused Ms. Davis' "stress", there was no reason to suspect it was related to sex harassment. When she complained of sex harassment by Mr. Redwine, the complaints were promptly investigated and the parties separated.

She did not work in a hostile environment. She was not subjected to retaliation for her complaints. She was not "required" to take any leave of absence, she requested both. She never stated why and more importantly, that she needed either leave due to sex harassment.

In accordance with Personnel Board Rule 7.31, Ms. Davis' name was placed on a Reemployment List when she took the 1 year Leave of Absence. The request form states that she had 10 days to appeal (to the Mayor or the Personnel Board) if she objected to being placed on a Reemployment list. Ms. Davis did not object and took the leave.

Ms. Davis' supervisor (Mr. Greg Wilson) did not say that she could not return because of a lack of available work. During her employment interview, he told her that when she went on her Leave of Absence, her duties were filled by another person. The City has an obligation to see that the work gets done.

Ms. Davis had not been constructively discharged. Her not being rehired was not retaliation. She was merely applying for vacant Laborer positions. The City interviewed her and several other applicants. That she was not rehired was simply due to others being more qualified than she.[76]

Plaintiff instituted the present action on March 14, 2001.[77]

## II. DISCUSSION

Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

---

[76] *Id.*, tab 3, at 1-2.

[77] Complaint (doc no. 1). The court notes that plaintiff asserts in her complaint that she filed this action within 90 days of receipt of the EEOC's notice of right to sue. The City does not offer any argument to the contrary.

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Congress thus recognized two bases for a claim of retaliation:  one for *opposition* to discriminatory practices, and another for *participation* in protected activity.

The filing of a formal charge of discrimination with the EEOC is protected under the "participation clause." *See, e.g., Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 702 (11th Cir. 1998). That clause protects actions and statements that "occur in conjunction with or after the filing of a formal charge with the EEOC," but "it does not include participating in an employer's internal, in-house investigation," conducted prior to the date on which a formal charge of discrimination is filed with the EEOC. *Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (citation and footnote omitted). The "opposition clause," on the other hand, provides protection to those employees "who informally voice complaints to their superiors or who use their employers' internal grievance procedures," *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989),[78] prior to the date on which a formal charge of discrimination is filed with the EEOC. *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (*cited with approval in Total System Services*, 221 F.3d at 1174 n.2). Here, of course, plaintiff's complaint implicates both clauses:  opposition as well as participation.

## A.     The *McDonnell Douglas* Analytical Framework

When evaluating employment discrimination claims supported by circumstantial evidence, courts are guided by the analytical framework announced in *McDonnell Douglas Corp. v. Green*, 411

---

[78] *See also, e.g., Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (same).

U.S. 792, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under that now familiar framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *see also Burdine*, 450 U.S. at 253-54 & n.6, 101 S.Ct. at 1093-94 & n.6. "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 685, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a prima facie case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *Burdine*, 450 U.S at 257, 101 S.Ct. at 1096, the presumption of discrimination created by the prima facie case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10, 101 S.Ct. at 1094-95 & n.10. The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d

at 1528 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106.

### 1.   The elements of a prima facie retaliation claim

Generally speaking, a plaintiff must prove three elements to establish a prima facie case of retaliation:  (1) she engaged in statutorily protected expression;[79] (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

When a retaliation claim is based upon conduct falling under the opposition clause of 42 U.S.C. § 2000e–3(a), a plaintiff also must demonstrate a good faith, reasonable basis for believing

---

[79] "Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment." *Johnson v. Booker T. Washington Broadcasting Serv.*, 234 F.3d 501, 507 (11th Cir. 2000) (citing *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)).

that the underlying, allegedly discriminatory practices constituted a violation of Title VII, as distinguished from proving that the employer actually engaged in an unlawful employment practice. *See, e.g., Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1187 (11th Cir. 2001); *Gupta*, 212 F.3d at 586 ("Retaliation is a separate violation of Title VII. 'To recover for retaliation, the plaintiff need not prove the underlying claim of discrimination which led to her protest, so long as she had a reasonable good faith belief that the discrimination existed.'") (quoting *Meeks*, 15 F.3d at 1021) (some internal quotation marks omitted); *Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir. 1989) ("[P]laintiff need only have had a 'reasonable belief' that an unlawful employment practice was occurring.").

This additional element of a prima facie case for a retaliation claim under the opposition clause has two constituent parts — both a subjective and an objective component — as the Eleventh Circuit observed in *Little v. United Technologies*:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and records presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.
>
> A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a *prima facie* case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978). *See also Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981) ("To effectuate the policies of Title VII and to avoid the chilling effect that would otherwise arise, we are compelled to conclude that a plaintiff can establish a prima facie case of retaliatory discharge under the opposition clause of [Title VII] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices."), *cert. denied*, 455 U.S.

20

1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982).

*Little*, 103 F.3d at 960 (emphasis in original) (footnote omitted).[80]

The Eleventh Circuit has not yet stated clearly whether a retaliation claim bottomed upon the

*participation* clause also is conditioned by a good-faith, reasonable belief requirement. In *Wideman*

*v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998), for example, the court side-stepped the

issue. *See id.* at 1454-55 ("[W]e need not decide whether protection from retaliation under the

participation clause is conditioned by a good faith, reasonable basis requirement."). In that case,

> the parties disagree[d] over whether a plaintiff who alleges she was retaliated against
> for filing an EEOC charge of discrimination must also establish, as part of her prima
> facie case, that she had a good faith, reasonable basis for filing the charge. Wideman
> argues that a plaintiff who alleges she suffered retaliation for filing an EEOC charge
> is pursuing her claim under the *participation clause* of 42 U.S.C. § 2000e-3(a), and
> that protection from retaliation under the participation clause is not conditioned by
> a good faith, reasonable basis requirement. Wal-Mart, on the other hand, notes that
> we have held that retaliation claims brought under the *opposition clause* of 42 U.S.C.
> § 2000e-3(a) *are* conditioned by a good faith, reasonable basis requirement, *see, e.g.,*
> *Little v. United Technologies*, 103 F.3d 956, 959-60 (11th Cir. 1997), and argues that
> we should not distinguish retaliation claims brought under the participation clause
> from those under the opposition clause. The district court agreed with Wal-Mart,
> holding that Wideman did not establish a prima facie case of retaliation because her
> EEOC charge of discrimination was not "objectively reasonable."
>
> Because we conclude that the facts of this case, viewed in the light most
> favorable to Wideman, show that Wideman had a good faith, reasonable basis for
> filing her charge, *we need not decide whether protection from retaliation under the*
> *participation clause is conditioned by a good faith, reasonable basis requirement.*
> ...

---

[80] *See also, e.g., Lipphardt*, 267 F.3d at 1187 ("The belief must also be measured against substantive law at the time of the offense.") (citing *Clover*, 176 F.3d at 1351 (holding conduct must be "close enough to support an objectively reasonable belief that it is" sexual harassment)); *Gupta*, 212 F.3d at 586 (entertaining plaintiff's retaliation claim, because "[a]lthough the conduct [plaintiff] complained about was not so severe and pervasive that it altered her working conditions, we cannot say that she lacked a 'reasonable good faith belief' that she was being sexually harassed"); *Harper v. Blockbuster Entertainment Corporation*, 139 F.3d 1385, 1388 (11th Cir. 1998); *Meeks*, 15 F.3d at 1021; *EEOC v. White & Sons Enterprises*, 881 F.2d 1006, 1012 n.5 (11th Cir. 1989); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989); *Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir. 1978); I Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 656-57 (3d ed. 1996) ("The rationale is that appropriate opposition should not be chilled by fear of retaliation — even if, as a matter of fact or law, there is no violation.") (footnote omitted).

*Wideman*, 141 F.3d at 1454-55 (emphasis supplied).[81]

The issue also was not resolved in *Gupta v. Florida Board of Regents*, 212 F.3d 571 (11th Cir. 2000), even though that court confronted a situation in which the plaintiff had engaged in activity protected by both the opposition and participation clauses of 42 U.S.C. § 2000e-3(a): *i.e.*, only after the plaintiff had pursued a sexual harassment complaint through her employer's internal grievance procedures did she later file a formal charge with the EEOC. *See id.* at 581.[82] The *Gupta* Court nevertheless addressed the plaintiff's retaliation claim in the following manner:

> Retaliation is a separate violation of Title VII. "To recover for retaliation, the plaintiff 'need not prove the underlying charge of discrimination which led to her protest,' so long as she had a reasonable good faith belief that the discrimination existed." *Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989)). Although the conduct Gupta complained about was not so severe and pervasive that it altered her working conditions, we cannot say that she lacked a "reasonable good faith belief" that she was being sexually harassed. As a result, the jury's verdict finding retaliation may stand independent of our reversal of the sexual harassment verdict if there was sufficient evidence presented at trial to support the retaliation verdict. *See Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1058-59 (11th Cir. 1999). ...

*Gupta*, 212 F.3d at 586-87. In other words, the *Gupta* Court *appears* to have addressed the good-faith, reasonable belief requirement as if it implicitly applied to the plaintiff's retaliation claim,

---

[81] Wideman testified she filed an EEOC charge because, among other reasons, she had been told by a supervisor that the "craft instructor" position she applied for would not be awarded "to anybody black."

> Wal-Mart's counsel conceded at oral argument that Wideman would have a good faith reasonable basis for her charge if Wideman had testified that she filed the discrimination charge because Dellinger told her she would not give the position to anybody black. As we have pointed out, Wideman did testify to that.

*Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 n.1 (11th Cir. 1998).

[82] *See also id.* at 577 ("The jury also found that the Board had violated Title VII by retaliating against Gupta because *she complained* about the alleged sexual harassment to the University, *and* because *she filed* a sexual harassment charged with the [EEOC]"), and at 587 ("As the district court correctly instructed the jury, Gupta 'participated in an activity protected by Title VII by *complaining about* sexual harassment *and filing a sexual harassment charge* with the United States Equal Employment Opportunity Commission.'") (emphasis supplied to both quotes).

regardless of whether that claim was posited on the opposition or participation clause of § 2000e-3(a). *See also id.* at 587 (setting forth only three elements of prima facie Title VII retaliation claim).[83] Therefore, until such time as the Eleventh Circuit directs otherwise, this court will proceed as if the good faith, reasonable belief requirement applies to both clauses of § 2000e-3(a).

## B.   Plaintiff's Prima Facie Case

The City does not contest that plaintiff engaged in protected activity, or that its failure to select her for re-employment in July of 1998 was an adverse employment action. Instead, the City argues that plaintiff has not demonstrated a good faith, reasonable belief that she was subjected to sexual harassment (the subject of plaintiff's internal complaints and first EEOC charge), or that the City's denial of plaintiff's application for re-employment was causally related to her three EEOC charges.

### 1.   "Good faith, reasonable belief" element

Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...." 42 U.S.C. § 2000e-2(a)(1). That statutory language does not mention, let alone define, "sexual harassment."[84] Even so, the Supreme Court held in *Meritor Savings Bank, FSB v. Vinson* that "unwelcome sexual advances that create an offensive or hostile working environment violate Title

---

[83] "In order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (citing *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir. 1999)).

[84] "The prohibition against discrimination based on sex was added to Title VII at the last minute on the floor of the House of Representatives." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 63, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (citing 110 Cong.Rec. 2577-2584 (1964)). As a consequence, "we are left with little legislative history to guide us in interpreting the Act's prohibition based on 'sex.'" *Id.* at 64, 106 S.Ct. at 2404.

VII. Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). The *Meritor* Court went on to say that Title VII is violated, and sexual harassment is actionable, whenever the workplace is permeated with "discriminatory intimidation, ridicule, and insult," *id.* at 65, 106 S.Ct. at 2405, that is "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).

The Supreme Court has repeatedly emphasized, however, that "sexual harassment is actionable under Title VII *only if* it is 'so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment."'" *Clark County School District v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (emphasis supplied) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (in turn quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. at ___)); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (holding that a Title VII hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment").

If this court were considering a sexual harassment claim, it *might be* inclined to hold that the facts outlined in section I.A *supra* were not so severe or pervasive as to alter plaintiff's working conditions, and thereby create an actionable, sexually hostile and abusive working environment. But that is *not* the issue; and this court — like the Eleventh Circuit in *Gupta*, which considered far less

egregious facts — "cannot say that [plaintiff] lacked a 'reasonable good faith belief' that she was being sexually harassed" by John Redwine. 212 F.3d at 586. Accordingly, this argument is rejected, and the court turns to the City's contention that plaintiff has failed to demonstrate a causal linkage between her protected activity and the City's denial of her application for re-employment.

### 2.    Causal link

The causation requirement is not onerous: "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).

Even so, "a plaintiff must show that 'the decisionmakers were aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'" *Gupta*, 212 F.3d at 590 (quoting *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1337 (11th Cir. 1999)) (internal marks omitted); *see also, e.g., Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action"). "It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression." *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1119 (11th Cir. 2001) (citing *Raney*, 120 F.3d at 1197 ("in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression")). "That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecommunications,*

*Inc.* 231 F.3d 791, 798-99 (11th Cir. 2000). "This awareness, however, may be established by circumstantial evidence." *Bass*, 256 F.3d at 1119 (citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) ("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. ... The defendant's awareness ... may be established by circumstantial evidence.")).

Circumstantial evidence, such as "a close temporal proximity between two events[,] *may* support a finding of a causal connection between those two events." *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (emphasis supplied) (citing *Brungart*, 231 F.3d at 799 (stating "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action *is* sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection") (emphasis supplied)); *see also, e.g., Bass,* 256 F.3d at 1119 ("Close temporal proximity between the protected activity and the adverse action *may be* sufficient to show that the two were not wholly unrelated.") (emphasis supplied) (citing *Gupta*, 212 F.3d at 590 ("For purposes of a prima facie case, 'close temporal proximity' *may be* sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'") (emphasis supplied) (in turn quoting *Farley*, 197 F.3d at1337)).

As the Supreme Court has observed, however, the temporal gap between events must be "very close." *Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) (per curiam) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997), and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992), for the proposition that three-month and four-month gaps, respectively, between an employer's knowledge of protected activity and an

adverse employment action are not sufficiently close to serve as circumstantial evidence of a causal

relationship between the two events).[85]

Even prior to the Supreme Court's decision in *Breeden*, the Eleventh Circuit had required

that the interval between events be brief. In *Bass*, for example, the plaintiff began to suffer adverse

employment actions within a matter of days after filing an EEOC charge on December 19, 1995:

> In December 1995, on his first day as a Training Instructor, Bass was assigned
> to clean out a warehouse — work ordinarily done by inmates supplied by the
> Department of Corrections.  Between December 1995 and April 1996, Bass had no
> routine work assignment, performed custodial and clerical duties, and usually was
> supervised by personnel who were less senior than he.  Middleton, who was in charge
> of the Training Instructors, and Chief Smith ordered Bass not to record on his work
> logs the custodial and clerical work he was performing.

*Bass*, 256 F.3d at 1101.  The Eleventh Circuit found that "[t]he close temporal proximity between

filing of the EEOC complaint and the adverse actions is sufficient in this case to satisfy the third

prong of the prima facie case of retaliation." *Bass*, 256 F.3d at 1119.  Moreover, in *Donnellon v.*

*Fruehauf Corp.*, 794 F.2d 598 (11th Cir. 1986), a case in which "the defendant's witnesses never

articulated clearly and consistently the reason that the plaintiff was discharged," the Eleventh Circuit

nevertheless held that there was substantial evidence that the plaintiff was discharged in retaliation

for filing a sex discrimination complaint, *including the fact that she was discharged less than one*

*month after filing her complaint.*

---

[85] In full text, the Supreme Court's statement in *Breeden* is as follows:

The cases that accept mere temporal proximity between an employer's knowledge of protected activity
and an adverse employment action as sufficient evidence of causality to establish a prima facie case
uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237
F.3d 1248, 1253 (C.A.10 2001).  *See e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10
1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992)
(4-month period insufficient).  Action taken (as here) 20 months later suggests, by itself, no causality
at all.

*Clark County School District v. Breeden*, 532 U.S. 268,143, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) (per curiam).

Plaintiff has demonstrated, and the City does not dispute, that both Wilson and Oden were aware of plaintiff's EEOC charges at the time of her July 21, 1998 interview for re-hire. Plaintiff also argues that the close temporal proximity between her June 12, 1998 EEOC charge and the City's refusal to re-hire her in July 1998 creates a genuine issue of fact as to her establishment of a causal connection. This court agrees. A temporal gap of approximately one month and ten days between the protected activity and the adverse employment action is sufficiently close to establish a temporal nexis and, thus, a causal connection between the protected activity and the adverse employment action. Even so, the temporal nexus of causation does not necessarily translate to subsequent dates on upon which plaintiff was considered for an available position, but not hired.

### C.   Plaintiff's Pretext Argument

The City asserts three reasons for failing to re-hire plaintiff in July of 1998:  she was unable to perform the required duties of a landscape laborer; her poor attendance record; and unfavorable recommendations from her supervisors. Plaintiff has not offered any evidence tending to indicate that the City's reasons for not re-hiring her in July of 1998 are pretextual. In fact, plaintiff admits that she could not perform the totality of duties required of HUF laborers. She informed Wilson and Oden during her July 21, 1998 interview that she could not perform any duties that would require her to inhale gasoline or machine fumes. Further, the City had a letter from Dr. Flippo on file stating that plaintiff could not perform duties that directly exposed her to machine fumes. Plaintiff argues that she later recovered sufficiently from her bronchitis, and was allowed to work around gasoline or machine fumes. She did not, however, notify the City of any change in her medical status. In any event, plaintiff failed to address the City's assertions that she had a poor attendance record, or that she received unfavorable recommendations from her supervisors.

28

As evidence that the City's stated reasons are pretextual, plaintiff first asserts that two of the three positions for which she interviewed in July of 1998 "were for the 'odd jobs' or 'special services' crew, where the duties involved planting, tilling, operating a bobcat, irrigation, planting flowers, and working in the nursery, but not cutting grass" — labors that she would have been able to perform.[86] Plaintiff further argues that she was more qualified because of her experience as a landscape laborer than the applicants who were ultimately hired: Derrick Blankenship, Lachaundra Chaney, and Adib Rashid.

In so arguing, plaintiff asserts that Blakenship formerly worked at Tyson Foods, Chaney formerly worked at Church's Chicken, and Rashid formerly worked at Wendy's. While all three had worked as temporary HUF laborers prior to July 1998, only plaintiff had experience as a full-time landscape laborer. Plaintiff does not offer, however, any evidence that Blankenship, Chaney, and Rashid were medically restricted from performing certain aspects of the job, that they had poor attendance records, or that they received negative performance evaluations from past supervisors. In fact, the only evidence in the record indicates that Blankenship, Chaney, and Rashid had excellent attendance records and favorable recommendations from their former supervisors.

Additionally, the Eleventh Circuit observed in *Lee v. GTE Florida, Inc.*, 226 F.3d 1249 (11th Cir. 2000), that "a plaintiff cannot prove pretext by simply showing that she was better qualified than the individual who received the position that she wanted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by sex [or, as here, a desire to retaliate]." *Id.* at 1235 (citing *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir.2000)). Plaintiff must further demonstrate that she was not only more qualified than the

---

[86] Plaintiff's Brief in Opposition to Summary Judgment (doc. no. 38), at 11.

other applicants, but that the disparity between her qualifications and those of the persons actually hired is so obvious as to "virtually jump off the page and slap you in the face." *Lee*, 226 F.3d at 1254 (citing *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999)). In the present case, plaintiff's qualifications are not so obvious. Rather, it is obvious that plaintiff, by her own admission, was medically restricted from performing the full scope of the duties of the position for which she applied.

Plaintiff next argues that the City's stated reasons for not re-hiring her are pretextual because the City treated other employees more favorably than it treated her. As evidence of the City's more favorable treatment of others, she offers that Leon Miller was placed on leave for pulling a knife on a supervisor.[87]  When Miller returned from leave, he was assigned to plaintiff's former position. Miller later left the City's employ, and received a disability pension despite his not being a City employee for at least five years. Plaintiff also applied for a disability pension, but was denied because she had not worked as a City employee for five years.[88]  Plaintiff does not allege, however, that she was denied a pension in retaliation for asserting her rights under Title VII.

She next cites Randy Rivers who was fired for stealing, but subsequently re-hired by HUF as a skilled laborer.[89]  Joey Rue and John Parker were doing work other than City work while on City time, and using City equipment.[90]  Both were later re-hired: Rue as a laborer, and Parker as a tree climber.[91]  Plaintiff does not offer any evidence as to Rue or Parker's other qualifications, or the time period in which they were re-hired. Nor does she assert that either Rivers, Rue, or Parker were hired

---

[87] Plaintiff's evidentiary submission (doc. no. 33), Tab 4 (plaintiff's deposition), at 115.

[88] *Id.*, at 115-16.

[89] *Id.*, at 117.

[90] *Id.*, at 118.

[91] *Id.*, at 119.

in preference to plaintiff.

Also, Michael Booth was employed as a truck driver within HUF, even though he had failed the required test for such a position. Plaintiff passed the City's required truck driving test, but when she inquired as to the availability of driver jobs within HUF, she was told that no such positions existed.[92] Plaintiff does not indicate whether she inquired as to a truck driving position within HUF before or after Booth was hired, nor does she allege that Booth was hired to fill that position in preference to her.

Plaintiff also argues that Ronald Benefield was employed with the Park and Recreation Board. He pulled a gun on a fellow employee, discharged the gun, and shot himself in the hand. Benefield was later allowed to return to work in a light duty capacity.[93] Plaintiff does not give a description of the light duties assigned to Benefield, however, or how long he worked in a light duty capacity. The court observes that plaintiff was also allowed to work in a light duty capacity for approximately one year.

Lastly, plaintiff asserts that a number of landscape laborers hired subsequent to July 1998 were convicted criminals. She does not indicate how long after July 1998 these hires took place. Also, there is nothing in the record tending to indicate that these employees were not qualified for the job, or that they were medically restricted from performing a portion of the required duties of a landscape laborer. There is no indication that any of these employees had poor attendance records or negative performance evaluations from past supervisors. Nor is there any indication that plaintiff applied, was considered, and was denied the same laborer positions for which these convicted

---

[92] *Id.*, at 119-21.

[93] Plaintiff's evidentiary submission (doc. no. 33), tab 4 (plaintiff's deposition), at 124.

criminals were hired. Thus, there is no evidence that any of the convicted criminals hired by the City were hired in preference to plaintiff.

Furthermore, the City's hiring and treatment of the above named employees does not tend to rebut the City's stated reasons for refusing to re-hire plaintiff, *i.e.*, her inability to perform the totality of the required job duties, her poor attendance record, and her unfavorable recommendations.

Accordingly, plaintiff's evidence falls short of establishing that the City's reasons for not re-hiring her in or after July 1998 constitute mere pretext.

### III. CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is due to be granted. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

Done this __7ᵗʰ__ day of May, 2002.

United States District Judge

32